IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEVEN BURGOS-CASTRO [40],

Defendant.

CRIMINAL NO.  12-192 (CCC)

## REPORT AND RECOMMENDATION

## INTRODUCTION

On September 27, 2012, a federal Grand Jury returned a four count Superseding Indictment against defendant Steven Burgos-Castro [40] ("Defendant" or "Burgos-Castro") and other fifty-two (52) co-defendants.  Defendant Burgos-Castro was only charged in Count Three with a conspiracy to posses with the intent to distribute controlled substances in a protected location.  All in violation of Title 21, United States Code, Section 841(a)(1), 846 and 860.  (Docket No. 124).

On May 21, 2014, Burgos-Castro filed a two and a half page Motion to Suppress, arguing the police officers had no reasonable suspicion for detaining and searching him on November 29, 2011.  Defendant claims that a person standing in the street with a fanny pack on his waist is no crime, is not suspicious and is very common among youngsters like Defendant.  Defendant avers, without any specificity, that he was a victim of constrain and coercive means.  Defendant claims he had an expectation of privacy in his fanny pack, and, as such, it could not be searched without a court order.  A statement under penalty of perjury was submitted by Defendant which describes his version of facts. Twenty-two (22)

baggies with crack cocaine were seized from the fanny pack, which are the ones being sought to be suppressed.  (Docket No. 1304).

On June 19, 2014, the presiding District Judge referred the Motion to Suppress to this Magistrate Judge for hearing and report and recommendation. (Docket No. 1362).

On July 3, 2014, the government filed its response to Defendant's Motion to Suppress, submitting the motion should be denied because Defendant voluntarily made admissions as to the drugs in his possession and handed the fanny pack to the agent and consented to its search.  Contrary to Defendant's contentions, the government avers the agents did not point guns at Defendant nor did they force Defendant to obtain the incriminatory evidence.  Therefore, the search was legal and the evidence found shall not be suppressed.

After granting several continuances, the suppression hearing was held on November 11, 2014.  The government called as its witnesses PRPD Denise Santiago-Cintrón ("PRPO Santiago") and Alexander Rodríguez ("PRPO Rodríguez").  Direct and cross examination of both witnesses were conducted.  Six (6) still framed photos were presented by the government which were admitted into evidence as Exhibits 1-6. The government rested its case.  (Docket No. 1611).

On December 4, 2014, the suppression hearing continued.  Defendant called DEA Special Agent José M. Betancourt ("SA Betancourt") and Defendant testified on his own behalf.[1]  Exhibit A was admitted over the hearsay objection of the government.  Task Force

---

[1] Defense counsel stated he informed Defendant of his rights and risks in testifying prior to the hearing. In an abundance of caution, the undersigned informed Defendant of the risks of testifying.

Officer Luis Torres ("TFO Torres") and PRPO Santiago were present in court and available to testify, as requested by Defendant, but they were not called to testify.  Defendant rested. (Docket Nos. 1674 and 1675).

### SUMMARIES OF TESTIMONIES AT THE SUPPRESSION HEARING

**A.    PRPO Santiago.**

PRPO Santiago testified at the suppression hearing on behalf of the government that she has been a police officer with the Puerto Rico Police Department ("PRPD") for over eighteen (18) years, has been a member of the strike force of several federal agencies and has worked on drug trafficking investigations of ICE, the DEA and ATF in the eastern part of Puerto Rico including Río Grande, Fajardo, Luquillo, Ceiba, Vieques and Culebra.  PRPO Santiago has participated in over two (200) hundred arrests for drugs and weapons related cases.  PRPO Santiago testified she worked in the investigation in federal court of the drug trafficking organization led by Julio De Jesús-Gómez[1] ("DTO") which started in 2009 and is the object of the instant case.  PRPO Santiago's duties in the investigation were to gather data and evidence, to identify the members of the DTO and to visit the drug points.  The investigation revealed that drug points were located in Fajardo in Mansión del Sapo Ward, Maternillo Ward, Puerto Real Public Housing Project, Veve Calzada Public Housing Project, Calle Chiquita and Quebrada Huertas.  PRPO Santiago testified she knows these locations and it was known at the time that the owner was Julio De Jesús-Gómez.  Specifically, PRPO Santiago has known Maternillo Ward and Mansión del Sapo Ward for eighteen (18) years. PRPO Santiago intervened in the area object of this case because the strike force impacted

all the drug points in said area.  PRPO Santiago described in detail the area of Mansión del Sapo Ward and Maternillo Ward where the drug points were located.  Surveillance and searches were done in these areas where members of the DTO were arrested with drugs and weapons.

PRPO Santiago testified she knew Defendant Burgos-Castro at the time because she had seen him before in the Jerusalen Ward[2],  Maternillo Ward, Mansión de Sapo Ward and the Relincho area.  DEA informants went to do undercover buys at the drug points and these buys were video recorded.  Defendant Burgos-Castro appears in a controlled buy on August 25, 2011 which was video recorded.  Several still framed photographs of this controlled buy were admitted into evidence as Exhibits 1-6.

Exhibit 1 is a still framed photograph of "Bar Pescadería El Relincho" which is in the Maternillo Ward next to a boat ramp.

Exhibit 2 is a still framed photograph of the boat ramp in front of El Relincho which is the area from which surveillance was done.  There is an abandoned house, behind the trees, which is used as a stash house for drugs.

Exhibit 3 is a still framed photograph which shows a buyer (confidential informant) in an area that is used to sell drugs.  Defendant Burgos-Castro is shown in the photograph facing back, wearing a white shirt and a black fanny pack around his chest.  Other members of the DTO are shown in the photograph including Abner Belardo in a black shirt who acted as a seller.  Drugs were bought by the confidential informant.

---

[2] Jerusalen Ward is located next to Maternillo Ward and Mansión del Sapo Ward, behind the Fajardo Court.  The father of Julio De Jesús-Gómez [1] resided in Jerusalen.

Exhibit 4 is a still framed photograph which shows the house of Alex Gómez who was the owner of the drug points in Maternillo Ward and Mansión del Sapo Ward.  Defendant Burgos-Castro is seen wearing a white shirt and a black fanny pack around his chest.

Exhibit 5 is a still framed photograph which shows Defendant Burgos-Castro in a white shirt with a black fanny pack around his chest with Abner Belardo and a buyer of drugs who is showing his back.

Exhibit 6 is a still framed photograph which shows Defendant Burgos-Castro in the right corner in a white shirt with a black fanny pack around his chest.  Crack was bought by the confidential informant during the controlled buy on August 25, 2011.

On November 29, 2011, PRPO Santiago was working for the Fajardo Strike Force and she went to the area they were investigating in two (2) patrol cars with seven (7) to eight (8) officers.  They went to the area to gather intelligence, take photographs, follow up, locate members of the DTO and for other fellow agents to get acquainted with the area.  They entered Tablazo Street, which is the main road that divides Maternillo Ward and Mansión del Sapo Ward, and they passed Rosa's Seafood to the right. It was day time. When they arrived to the drug point area at Mansión del Sapo Ward, there is a house stable and a cock fight area, one in front of the other.   When they passed the cock fight area to the left, PRPO Santiago saw Defendant Burgos-Castro in the middle of the street accompanied by a young man with dark skin.  There were other ten (10) to twelve (12) people in the area, but the ones in the middle of the street were Defendant Burgos-Castro and the dark skinned individual.  PRPO Santiago, who was driving the front police unit, recognized about five (5) people in the area, including Defendant Burgos-Castro.  She also recognized other members

of the DTO, namely, Abner Belardo, Pablo Calzada, Emanuel Moyano and José Porfil. When PRPO Santiago's unit approached the area where Defendant Burgos-Castro was located, the dark skinned individual fled running towards the Fajardo River.  The patrol unit was about two (2) feet away from Defendant when the other individual fled.  When the individual fled, Defendant Burgos-Castro stood to the left and PRPO Santiago continued in the patrol car at about 5 mph.  She lowered the window and asked Defendant if everything was "ok." Defendant responded: "everything is all right, what I have here are drugs."    PRPO Santiago asked Defendant what was what he had just told her and Defendant said that what he had were drugs.  PRPO Santiago told her colleague that Defendant was crazy in saying that he had drugs.  PRPO Santiago opened the door and touched Defendant's fanny pack which he had in his chest.  Defendant told PRPO Santiago that he had drugs inside the fanny pack but she did not know if Defendant had a weapon. PRPO Santiago thought there was a weapon inside the fanny pack because it looked full. PRPO Santiago testified it is normal to get to a drug point and see a runner (who carries weapons and cash) fleeing when she/he sees the police. The person carrying the drugs stays for the police to go after him/her.

PRPO Santiago explained she grabbed Defendant Burgos-Castro's fanny pack to verify if there were drugs inside because she has seized drugs in fanny packs before and has seen video recordings in which drugs are kept in fanny packs.  PRPO Santiago testified she has seized drugs in fanny packs about twenty (20) times.  PRPO Santiago told Defendant to take the fanny pack off.  Defendant released it and they both placed it on top of the hood of the patrol unit.   The other agents stepped off the vehicle.   PRPO Santiago asked

Defendant to open the fanny pack and he complied. PRPO Santiago saw the drugs inside the fanny pack and she closed it. PRPO Santiago told Defendant Burgos-Castro that he was under arrest and she informed him of his constitutional rights. PRPO Santiago stated twenty-two (22) baggies with crack cocaine were seized from Defendant's fanny pack.

PRPO Santiago averred PRPO Rodríguez was behind PRPO Santiago in the other patrol unit and he tried to follow and apprehend the dark skinned individual who fled.

On cross-examination, PRPO Santiago testified she was not present when the photographs in evidence were taken. The photographs (Exhibit 1-6) do not show any drugs, money or firearms. Defendant was released the same day he was arrested in the afternoon hours after he was interviewed and the protocol was followed. PRPO Santiago stated that all the agents were inside the patrol cars and none of the agents walked towards Defendant. PRPO Santiago did not ask Defendant whether he had drugs in his possession. PRPO Santiago admitted fanny packs are common and many people buy them. However, that does not mean the fanny packs contain something illegal. Prior to November 29, 2011, Defendant had not been arrested to PRPO Santiago's knowledge. No drug transaction, money or weapons were seen on November 29, 2011.

On re-direct examination, PRPO Santiago testified none of the agents drew their weapons at Defendant Burgos-Castro.

## B.   PRPO Rodríguez.

PRPO Rodríguez testified he has been a police officer with the PRPD for twenty-one (21) years. He has worked in many drug and weapons' related cases and investigations in the Humacao/Fajardo area. PRPO Rodríguez has worked in five (5) investigations which

United States of America v. Steven Burgos-Castro [40]
Criminal No. 12-192 (CCC)
Report and Recommendation
Page 8

have been presented in federal court. The duties of PRPO Rodríguez in these investigations was to gather information (including incident and statistical reports), analyze the areas of the drug points, video record drug sales at the drug points and conduct surveillance. These videos normally depict armed individuals carrying out sales of drugs. PRPO Rodríguez was familiar with the drug points at the time in the area because of the many times he had participated in interventions there.

PRPO Rodríguez is familiar with the investigation in this case which started in 2009 and with the area of Fajardo including El Relincho, Maternillo Ward and Mansión del Sapo Ward. PRPO Rodríguez conducted surveillance, video recordings, accompanied others who were conducting recordings, and identified persons who belonged to the DTO. PRPO Rodríguez had intervened in these areas before November 29, 2011. PRPO Rodríguez described the area of the drug points in Maternillo Ward and Mansión del Sapo Ward.

On November 29, 2011, PRPO Rodríguez was traveling in a marked patrol unit behind the patrol unit driven by PRPO Santiago. There were two (2) patrol units in that area to take photographs, identify members of the DTO and to make recognizance of the Mansión del Sapo Ward area. There were seven (7) agents because the area was "hot." PRPO Rodríguez explained that "hot" means that there had been violent incidents in that area including incidents with police officers.

Once the police officers were approaching the area of the drug point and following the first marked patrol unit, PRPO Rodríguez saw two (2) young persons standing in the middle of the road to the side close to the cock fight area. Other persons were also in the area and members of the DTO were identified. One of the two (2) persons in the middle of

the street had a fanny pack on the chest and the other one started running when he saw the police officers. The police units stopped, PRPO Rodríguez stepped out and followed the individual who fled for the safety of the officers. PRPO Rodríguez chased the individual until he reached the end and did not present a risk to the officers. PRPO Rodríguez testified the chase started because he feared the individual could harm them because the area was a known drug point.

PRPO Rodríguez explained he had intervened at drug points many times before and the behavior that is seen when police officers enter a drug point is to see people start running to avoid being arrested. Moreover, they destroy or throw away evidence. PRPO Rodríguez explained people at drug points could be armed and could shoot at the police officers.

After chasing the young individual who fled, PRPO Rodríguez returned to where the other officers were in front of one of the patrol units and he observed Defendant Burgos-Castro saying his fanny pack contained controlled substances and giving it to PRPO Santiago. Defendant opened the fanny pack, PRPO Santiago verified it and, then, PRPO Santiago took the same and placed it on the hood of the patrol car. PRPO Rodríguez saw the fanny pack contained baggies with controlled substances.

PRPO Rodríguez testified he has seen fanny packs before being used to hide controlled substances and firearms.

On cross-examination, PRPO Rodríguez stated that, prior to November 29, 2011, he had never arrested Defendant Burgos-Castro. PRPO Rodríguez stated TFO Torres and PRPO Santiago were at the scene. PRPO Rodríguez informed all the officers were armed

United States of America v. Steven Burgos-Castro [40]
Criminal No. 12-192 (CCC)
Report and Recommendation
Page 10

but no weapons were drawn.  No drugs were seen before the intervention.  The fanny pack was closed.  When PRPO Rodríguez returned from the chase, he saw two (2) officers close to Defendant Burgos-Castro, including PRPO Santiago and TFO Torres.

**C.    SA Betancourt**.

SA Betancourt testified on behalf of Defendant.  SA Betancourt testified he is a DEA special agent who prepared a DEA 6 Report which he signed.  Exhibit A[3].  SA Betancourt testified he interviewed TFO Torres and others of the Fajardo Strike Force in relation to Defendant Burgos-Castro's arrest.  The officers he interviewed of the Fajardo Strike Force were PRPO Santiago and Lieutenant Marques.  When asked about the names in Exhibit 6 under item "9", SA Betancourt stated that, according to the interview of TFO Torres, those mentioned in that item were the agents present at the scene when Defendant Burgos-Castro was arrested. SA Betancourt testified he was not present during Defendant Burgos-Castro's arrest. SA Betancourt prepared the DEA 6 with the information TFO Torres provided to him.  According to the DEA 6 (Exhibit A), PRPO Santiago asked Defendant Burgos-Castro what he had in his fanny pack.

On cross-examination, SA Betancourt testified that, according to item "10" of Exhibit A, he prepared the report for the acquisition of the two (2) exhibits mentioned therein and the arrest of Defendant Burgos-Castro.  SA Betancourt prepared the DEA 6 report after he interviewed TFO Torres.  SA Betancourt was the agent in charge of the investigation and

---

[3] The DEA 6 was objected by the government as hearsay inasmuch as it was being offered for the matter of the truth asserted and SA Betancourt did not have personal knowledge. All the information contained therein was provided to SA Betancourt by TFO Torres.  The document was admitted into evidence inasmuch as TFO Torres was available to testify.  However, ultimately, Defendant did not call TFO Torres to the stand.

United States of America v. Steven Burgos-Castro [40]
Criminal No. 12-192 (CCC)
Report and Recommendation
Page 11

TFO Torres was his subordinate. The area of Mansión del Sapo Ward was being investigated since 2009 for drug trafficking activities. After Defendant Burgos-Castro was arrested, he informed to the agents that he wanted to cooperate. Defendant was released on the same day of his arrest and was driven by the agents to his house. Defendant was interviewed on another day and he decided not to cooperate. No complaints were made by Defendant.

On re-direct examination, SA Betancourt testified he never interviewed Defendant Burgos-Castro.

## D. **Defendant Burgos-Castro**.

Defendant Burgos-Castro testified at the suppression hearing that, on November 29, 2011, he was walking in the Mansión del Sapo area and he encountered this person that he knew by sight. Defendant crossed the street which was flooded. He then bent to clean his sneakers and noticed someone passing next to him. Defendant got up and saw several officers pointing guns at him and giving him orders. The officers approached Defendant Burgos-Castro, put him against a wall and frisked him. One male officer turned Defendant around and ordered him to show him his fanny pack. Defendant opened the fanny pack, the officer saw it and did not find anything illegal. The male officer told Defendant to close the fanny pack and told him he could continue on his way. Then, a female officer (identified as PRPO Santiago) pulled Defendant and tugged his fanny pack. PRPO Santiago took the fanny pack and found the drugs. Defendant was taken to the police station where Defendant was threatened with getting time in prison. The officers wanted Defendant to talk. Some time after, Defendant was released and taken to his house.

On cross-examination, Defendant Burgos-Castro was confronted with the statement under penalty of perjury which was submitted in support of the Motion to Suppress. (Docket No. 1304-1). Defendant admitted that in the statement under penalty of perjury he did not include details such as that a male officer first searched the fanny pack and did not find anything, that he then bent down to clean his sneakers, that he was just walking in the area, and that he recognized someone by sight. Defendant Burgos-Castro admitted he never complained to federal or state authorities nor in court of the alleged coercion and use of firearms against him.

## LEGAL DISCUSSION

## I. Investigatory Stop based on Reasonable Suspicion.

The issue of whether Defendant's stop was legal and based on reasonable suspicion as required by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968) is first addressed.

An investigative stop, also known as a Terry stop, *see* Terry v. Ohio, 392 U.S. at 1, occurs when a police officer, "acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Id.* at 6, 88 S.Ct. 1868 (citing United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).

With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.* The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997) (citing United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)). To fulfill the second prong, the Court must examine the totality of the circumstances. See United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991); see also United States  Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998).

Turning to the instant case, under the totality of the circumstances and taking into the account the testimonies of the two (2) PRPD Officers at the suppression hearing, along with the documentary evidence introduced into evidence, it is concluded that there was reasonable suspicion to stop and frisk Defendant Burgos-Castro on November 29, 2011. After assessing credibility, the testimonies of both Police Officers are credited more than that of Defendant Burgos-Castro.  The Court explains.

Both PRPO Santiago and PRPD Rodríguez are highly experienced police officers of the PRPD assigned to the federal task force which were familiar with the area and the drug point in which Defendant Burgos-Castro was arrested.  They both were consistent in their testimonies as to a federal investigation of a DTO since 2009 in the Maternillo Ward and Mansión del Sapo Ward. Both officers explained that, as part of their duties in this investigation, they gathered information, participated in surveillance of the area and in the taking of photographs and videos of the area, identified members of the DTO, among others.  PRPO Santiago and PRPD Rodríguez testified there was a known drug point in the Maternillo Ward and Mansión del Sapo Ward.  To this particular, PRPO Santiago testified as to Defendant Burgos-Castro's participation in a controlled buy in the same area in August 2011, as depicted in Exhibit 2-6.

Both officers were consistent as to the events that transpired on November 29, 2011 which led to Defendant Burgos-Castro's arrest.  The officers arrived at the known drug point area in two (2) marked police units.  They saw Defendant Burgos-Castro in the middle of the street with a black fanny pack in his chest, similar to the one they had seen Defendant using during the controlled buy on August 25, 2011.  *See*, Exhibits 2-6. Both officers testified as to the common use of fanny packs by persons to hide drugs and weapons.  As a matter of fact, Defendant Burgos-Castro and other members of the DTO had been previously observed selling drugs while wearing fanny packs in the area.  *See* Exhibits 2-6. Defendant Burgos-Castro was standing next to another individual who fled when he saw the police officers.  PRPD Rodríguez gave chase, trying to apprehend the individual who fled. Both officers testified that, the behavior they observed that day of both individuals, was consistent with the one they had seen previously in the drug points in which the individuals run and some flee once they detect the presence of the police.

Moreover, PRPO Rodríguez identified the area as "hot" inasmuch as incidents with firearms and the police had happened before. Normally, individuals at the drug points are armed. To this effect, PRPO Santiago testified she touched Defendant's fanny pack for their safety because it looked full and she thought it could contain a firearm.

The above scenario revolving around Defendant Burgos-Castro was enough to create a reasonable suspicion on the officers to stop Defendant Burgos-Castro.  Defendant, who at the time was a known member of the DTO inasmuch as he had been previously identified at a drug point as submitted in the Exhibits, was seen at a known drug point in a "hot area" which had been under surveillance with a fanny pack in his chest next to another individual

United States of America v. Steven Burgos-Castro [40]
Criminal No.  12-192 (CCC)
Report and Recommendation
Page 15

who fled when he saw the presence of the police officers.  *See* United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744 (2002) (an officer may draw on his "own experience and specialized training to make inferences from and deductions about the cumulative information … that might well elude an untrained person.").

In Illinois v. Wardlow, 528 U.S. 119, 124-26, 120 S.Ct. 673 (2000), the Supreme Court held that officers had reasonable suspicion when they encountered a man who fled from them without provocation in a "high crime area." The Court explained that [a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime". But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, the Supreme Court has previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a Terry analysis.

The above factual scenario, coupled with Defendant Burgos-Castro's admission to PRPO Santiago that he was in possession of controlled substances when he was asked by PRPO Santiago if everything was "ok", was more than enough to give reasonable suspicion to the agents. Both police officers testified Defendant consented to the search of his fanny pack, after making the admission that he was in possession of controlled substances, without being threatened and no firearms being drawn or pointed at him.

Proof of valid consent to search requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. United States v. Marshall, 348 F.3d 281 (1st Cir. 2003).

A warrantless search does not offend the Fourth Amendment when it is properly circumscribed and stands on a voluntary consent given by a person so authorized. United States v. Chaney, 647 F.3d 401, 405-06 (1st Cir. 2011). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.' " United States v. Chhien, 266 F.3d 1, 7 (1st Cir. 2001) (quoting Schneckloth v. Bustamante, 412 U.S. 218, 225, 93 S.Ct. 2041 (1973)). In determining voluntariness, the focus is often on whether the individual's will has been overborne and his capacity for self-determination critically impaired. See Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041; United States v. Calderón, 77 F.3d 6, 9 (1st Cir. 1996).

Defendant Burgos-Castro's admission, the fact that the person standing next to Defendant fled from the scene when the police approached, the agents' knowledge of the use of that location as a drug point, and the fact that Defendant Burgos-Castro had been previously seen and video recorded in the area in at least one controlled substances buy, triggered the response of the agents which was justified under the totality of the circumstances.

Defendant's testimony that he was forced to surrender his fanny pack and was pointed at with firearms is not credited, inasmuch as it is self-serving and extremely convenient. The fact that Defendant's testimony at the suppression hearing provided some specific details as to Defendant's alleged actions on November 29, 2011 which were not

included in the statement under penalty of perjury submitted with the Motion to Suppress militates against his credibility.  Moreover, the unrebutted fact that Defendant Burgos-Castro never complained to the federal or state authorities about the use of firearms on November 29, 2011 also hinders his credibility.

In addition, no credible evidence was presented of the allege coercion and use of firearms against Defendant.  No credible evidence was presented either to support Defendant's allegation that he did not voluntarily consent to the search of his fanny pack nor expressed that he had drugs.

Finally, Defendant Burgos-Castro's attempt to use SA Betancourt's testimony in support of his contentions in his Motion to Suppress was fruitless.[4]  SA Betancourt was emphatic in that he was not present at the scene and all the information included in the DEA 6 report he drafted and signed was provided to him by TFO Torres.  The government objected SA Betancourt's testimony as hearsay because it was being offered to establish the truth of the matter asserted.  The DEA 6 report was allowed into evidence inasmuch as Defendant Burgos-Castro had requested the presence of TFO Torres at the hearing to testify on his behalf.[5]  However, Defendant ultimately chose not to call TFO Torres as a witness at the hearing even though Defendant had an opportunity to do so.[6]  Thus, SA Betancourt's

---

[4] Defense counsel mostly posed leading questions to SA Betancourt even though he was on direct examination and was not hostile.  The government initially did not object to the leading questions.

[5] The subpoena for TFO Torres was returned as un-executed, as he is retired.  However, the prosecutor contacted TFO Torres and he was present in court and available to testify.

[6] It is worth noting that defense counsel filed multiple motions requesting the issuance of subpoenas for attendance of law enforcement officers to the suppression hearing which were served by the US Marshal Service, thereby expending numerous resources to later refrain from calling most of said witnesses.

testimony, which was based on the DEA 6 and Exhibit A, is hearsay and, as such, is not credited.

In view of the above, and under the totality of the circumstances, there was reasonable suspicion to stop and frisk Defendant Burgos-Castro on November 29, 2011 under Terry.

## II.    Warrantless Arrest.

Defendant Burgos-Castro's Motion to Suppress seems to challenge also his arrest and the search of his fanny pack.  A warrantless arrest is constitutionally valid if, at moment the arrest is made, officers have probable cause to make it, that is, if at that moment facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.  United States v. Ayres,  725 F.2d 806 (1st Cir. 1984); Young, 105 F.3d at 6 (same).  Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives.  Id.

Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime and on the other hand, in recognizing the necessity to afford 'fair leeway for enforcing the law in the community's protection.'" Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311 (1949).

United States of America v. Steven Burgos-Castro [40]
Criminal No.  12-192 (CCC)
Report and Recommendation
Page 19

A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. See United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994).  To establish probable cause, the government "need not present the quantum of proof necessary to convict." United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991); United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).

The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999), and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Meade, 110 F.3d at 198 n. 11; United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).

The determination of whether probable cause exists must not rest on isolated facts but depends on the cumulative effect of the facts in the totality fo the circumstances. Probability, not a *prima facie* showing of criminal activity, is the standard.  Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333 (1959).

Both PRPO Santiago and PRPO Rodríguez testified they arrived at the known drug point (which had been under investigation) in two (2) patrol units, they saw Defendant Burgos-Castro in the middle of the street at a known drug point with a fanny pack in his chest similar to the one he had been seen before during a controlled buy.  Defendant was standing next to another individual who fled when he saw the police officers, and PRPD

United States of America v. Steven Burgos-Castro [40]
Criminal No.  12-192 (CCC)
Report and Recommendation
Page 20

Rodríguez chased the other individual, trying to apprehend him. PRPO Santiago testified she asked Defendant whether everything was "ok" and he replied that what he had inside his fanny pack were drugs.  PRPO Santiago then asked Defendant to open the fanny pack for their safety because she believed it had a weapon inasmuch as it appeared to be full.  In addition, both officers testified as to the use of fanny packs by individual at the drug point to carry drugs and weapons.  Once Defendant opened the fanny pack, baggies with a controlled substance were observed by PRPO Santiago.  All these facts are clear indicia the Police officers had probable cause to arrest Defendant Burgos-Castro for possession of controlled substances.

Defendant Burgos-Castro's testimony that he did not consent to the search of his fanny pack is in clear contradiction to the testimonies of both police officers.  Defendant's testimony that the fanny was opened by the officers against his will is self-serving and cannot be credited.  Both police officers testified no weapons were drawn at Defendant and he voluntarily admitted to the possession of drugs in his fanny pack when asked if everything was "ok".  Defendant Burgos-Castro had the opportunity to present other evidence on his behalf to corroborate his version of facts and he chose not to. Thus, no credible evidence in support of the alleged coercion was presented.

The inquiry into probable cause to support an arrest is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of arrest objectively provided probable cause to arrest. See United States v. Jones, 432 F.3d 34 (1st Cir. 2005)(citing Devenpeck v. Alford, 543 U.S. 146, 125 S.Ct. 588 (2004).

In view of the foregoing, the warrantless arrest of Defendant Burgos-Castro was based on probable cause and was legal.

## CONCLUSION

Taking into account the testimonies and evidence presented at the hearing, and pursuant to the preponderance of the evidence and considering the totality of the circumstances, and after assessing credibility, there was reasonable suspicion to stop and frisk Defendant Burgos-Castro under Terry. Also, the search of Defendant Burgos-Castro's fanny pack was based on Defendant's consent to the search and there was probable cause for his arrest for possession of controlled substances. Thus, it is recommended that defendant Burgos-Castro's Motion to Suppress be DENIED. (Docket No. 1304).

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986). See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 10th day of December of 2014.

s/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE